

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| MEHRI MOTAKEF, | CASE NO.:  SACV 03-1509 CJC (ANx) |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT |
| v. | |
| WOODCREST HOME OWNERS' ASSOCIATION, GOLD COAST ENTERPRISES, and JERRY UFFELMAN | |
| Defendant. | |

Docketed
Copies / NTC Sent
JS - 5 / JS - 6
JS - 2 / JS - 3
CLSD

Defendants Woodcrest Home Owners Association ("WHOA"), Gold Coast Enterprises, and Jerry Uffelman seek summary judgment of Plaintiff Mehri Motakef's claims for violation of the federal Fair Housing Act, 42 U.S.C. §§ 3604 and 3617, California Civil Code sections 51, 51.5, 51.7, and 52.1, the California Fair Employment and Housing Act ("FEHA"), California Government Code sections 12927 and 12955, "conspiracy to violate civil rights" in violation of 42 U.S.C. § 1985, and "neglect to prevent violation of civil rights" in violation of 42 U.S.C. § 1986.  Defendants argue that Ms. Motakef's claims are time-barred and that she has failed to present evidence sufficient to raise a triable issue of fact as to

1    each of them.  Ms. Motakef opposes summary judgment on the grounds that

2    Defendants have failed to produce various documents in discovery, that she needs

3    further discovery to oppose summary judgment, and that triable issues of fact exist

4    on her claims.  She also requests leave to file a Third Amended Complaint adding

5    four new defendants and additional causes of action based on "events which have

6    happened since the date this case was filed." (Motion for Leave to File a Third

7    Amended Complaint, p.5.)  As explained below, the Court will grant in part and

8    deny in part Defendants' motion for summary judgment, and will deny Ms.

9    Motakef's motion for leave to file a Third Amended Complaint.

10

11   **I.    Background**

12

13          This case concerns alleged national origin discrimination by a homeowners'

14   association against Plaintiff Mehri Motakef and her family, who are Iranian-

15   American.  In February 1995 the Motakefs moved to a house in the 68-home

16   community of Woodcrest in Anaheim, California.  (UDF No. 1-3.)  Woodcrest is

17   administered and managed by Defendant Woodcrest Homeowners' Association

18   ("WHOA").  (*Id.*)  WHOA is responsible for enforcing covenants created by

19   Woodcrest's developer, which charge WHOA with responsibility for managing the

20   common areas of the community, including a slope located directly behind the

21   Motakefs' home.[1]  (UDF No. 3.)  Between 1993 and either April 1 or June 25,

22

23          [1] All residents of the Woodcrest community agree, on purchasing their property, to

24   abide by a set of Conditions, Covenants, and Restrictions ("CC&Rs").  (Ms. Motakef's
     Exh. A, p.3.)  They also become members of the Woodcrest Homeowners' Association

25   upon purchasing their property.  (*Id.*, p.8.)  The Declaration of Restrictions, by which

26   residents are bound, states that the WHOA is responsible for "maintain[ing], or caus[ing]
     to be maintained, the slope areas...substantially as originally improved by [the developer],

27   in a neat, safe, sanitary, and orderly condition (including the repair and replacement of

28   landscaping and improvements when necessary or appropriate) and in such manner as to
     enhance their appearance and to preserve established slope ratios, prevent erosion and

2002,[2] the WHOA contracted with Defendant Gold Coast Enterprises to conduct the daily management and maintenance of Woodcrest.  (Uffleman Decl., ¶ 4.)  Mr. Uffleman is the president and owner of Gold Coast, and the WHOA's property manager.  (*Id.*, ¶ 3.)  The WHOA acts through an elected board of five directors, who sometimes consult Mr. Uffleman for advice in carrying out their responsibilities.  (Lazarus Decl., ¶ 7, UDF No. 5.)  Between 1997 and 1999, Ms. Motakef served as WHOA's Vice President.  (Motakef Depo., 21:7-24.)

## A.    Disputes Between the Motakefs and their Neighbors, and Correspondence with Mr. Uffelman

Soon after the Motakefs moved to Woodcrest, hostile relations developed between them and two neighboring families, the Sachdevs and the Havels.  The tenor of these relations is reflected in a series of letters the Motakefs and their neighbors wrote to each other and to Mr. Uffelman.  In the earliest letter, dated

---

sliding problems, and facilitate the orderly discharge of water through established drainage systems."  (*Id.*, pp. 14-15.)  The WHOA also is obligated to "maintain ... all private drainage facilities and systems located within the access areas ... described in the Slope Control Area easement plan in a neat safe, sanitary and orderly condition," maintain drainage facilities in lots annexed to the community, and "enforce the provisions of this Declaration by appropriate means, including...the expenditures of funds of the [WHOA], the employment of legal counsel and the commencement of actions."  (*Id.*, p.15.)  Other restrictions prevent property in the community from being used (1) "to disturb the neighborhood or occupants of adjoining property, or to constitute a nuisance, or in violation of any public law, ordinance or regulation in anywise applicable thereto," or (2) for "business or commercial activity."  (*Id.*, p.18.)  The CC&Rs contain restrictions pertaining to drainage, diseased plants, view obstruction, and architectural additions to homes.

[2] Neither party has produced Gold Coast's contract with WHOA, and the parties dispute when the contract ended.  (Ms. Motakef's Statement of Genuine Issues, No. 6.)  For purposes of summary judgment, the Court will assume that Ms. Motakef states the correct date for the end of the contract.

April 26, 1998, Ms. Sachdev complains to Mr. Uffelman that Ms. Motakef insulted Ms. Sachdev while Ms. Sachdev was installing tressels on her property, and that Ms. Motakef frequently called the police for "inconsequential reasons." (Defendants' Exh. 5.)   On June 29, 1998, Ms. Motakef's husband, Jahan Motakef, wrote a letter to Mr. Uffleman saying that his family "has been subjected to continuous badgering and harassment by our neighbors," and that Mr. Havel and his son had been trespassing on the Motakefs' property to trim trees. (Defendants' Exh. 6.) The letter also complained about a "dangerous and unsightly wall" and a "dangerous tree" on the Havels' property, the latter of which Mr. Motakef said "has encroached on my property" and was dangerous. (*Id.*) Mr. Motakef stated that the Havels had subjected his family to verbal abuse. (*Id.*) The letter concluded by asking Mr. Uffleman and the WHOA to ask the Havels to trim their tree and trim or clear the front hedges, and to stop trespassing on the Motakefs' property. (*Id.*)

On June 29, 1998, Mr. Motakef wrote another letter to Mr. Uffleman, citing "continuous harassment" by the Sachdevs. (Defendants' Exh. 7.) Mr. Motakef said Mr. Sachdev was continually making abusive remarks to the Motakefs' children, and threatening to "butcher" their son's pet bird. (*Id.*) The letter also stated that the Sachdevs had created a drainage system that caused flooding on the Motakefs' property, that trees on the Sachdevs' property were diseased and housing rodents, and that the trees were blocking the Motakefs' view. (*Id.*)   Mr. Motakef said the Sachdevs had refused to correct the problems, had verbally abused Ms. Motakef and her children on several occasions, and had "harass[ed]" Ms. Motakef by sending their dog to attack her while she worked in her yard. (*Id.*)   An August 21, 1998 letter from Shireen Sachdev to Mr. Uffleman states that Ms. Motakef had complained about noise generated by the Sachdevs' air conditioning unit, and that the Motakefs had called the police to the Sachdevs' house twice in

1  the middle of the night to inspect the unit. (Defendants' Exh. 8.)  The letter stated

2  that the City of Anaheim Code Enforcement Agency had inspected the unit and

3  found that the noise level was under the permissible limit of 60 decibels.  (*Id.*)

4  The letter also discussed a dispute with the Motakefs regarding a wrought-iron

5  fence on the Sachdevs' property, which the Motakefs wanted to remove.  (*Id.*)

6  The letter stated that the Motakefs had no right to a completely unrestricted view

7  under the Conditions, Covenants, and Restrictions that governed the community,

8  that there was no drainage problem, that the Motakefs' complaints constituted

9  harassment, and that the WHOA's failure to reprimand the Motakefs was an

10  "abrogation of duty ... to provide a peaceful living environment" for residents.

11  (*Id.*)  Ms. Motakef apparently read Ms. Sachdev's August 21, 1998 letter, and

12  wrote an acrimonious response to Ms. Sachdev on August 24, 1998.  (Defendants'

13  Exh. 10.)  The response accused the Sachdevs of harassing the Motakefs' children

14  "for the past two years" and threatened legal action.  (*Id.*)

15

16  The Motakefs' relations with the Havels were no better than their relations

17  with the Sachdevs.  An undated letter from Audrey Havel to Mr. Uffleman states

18  that the Motakefs had dug a ditch on their property, causing water to drain onto

19  the Havels' property, and that Ms. Motakef called the "Code Enforcement

20  Services of Anaheim" to report a "6 or 7 inch divider" in Ms. Havel's front yard.

21  (Defendants' Exh. 10.)  Ms. Havel also stated that the Motakefs had called the

22  police numerous times for trivial reasons, including a time when Ms. Havel

23  apparently trimmed a hedge on the Motakefs' property that the Motakefs had

24  refused to cut.  (*Id.*)  According to Ms. Havel, Ms. Motakef's actions constituted

25  "harassment."  (*Id.*)  She asked Mr. Uffleman "please help me ... because this is

26  your Vice President."  (*Id.*)

27

28  On September 28, 1998, Mr. Uffleman sent a letter to the Motakefs, copied

to attorney Craig Bickler, outlining four "unresolved issues regarding yourselves and...the Sachdevs." (Defendants' Exh. 11.)   The letter stated the issues were (1) noise from the Sachdevs' air conditioning unit, (2) the location of the wrought iron fence between the Sachdevs' and the Motakefs' property, (3) water drainage from the Sachdevs' property to the Motakefs' property, and (4) obstruction of the Motakefs' view by the Sachdevs' landscaping. (*Id.*) The letter stated that the first issue had been resolved at an August 1998 WHOA board meeting, at which the board discussed a City of Anaheim report saying the air conditioning noise did not violate city ordinances. (*Id.*) The letter noted that the City appeared to have issued a contrary report stating that the noise was in violation of the Code, but recommended that the Motakefs "have the City follow through in resolving this noise dispute as they have submitted opposite opinion letters." (*Id.*) The fence issue, the letter stated, "is not an Association issue [and] will be dropped from future discussions" because the Motakefs and Sachdevs disputed whose property the fence was on. (*Id.*) The letter suggested that the parties consult a licensed surveyor. (*Id.*) The water drainage issue, the letter stated, had been resolved because the Sachdevs had "agreed that they will water test their property to determine if this improper drainage does occur." (*Id.*) Finally, as to the view issue the letter stated that "[t]his decision should be discussed and compromised by the two (2) homeowners since the restriction is spaced landscaping" rather than total obstruction. (*Id.*)

On October 20, 1998, Ms. Motakef sent a letter to Mr. Uffleman regarding a dispute between the WHOA board and a Woodcrest resident named Dr. Kabir. (Defendants' Exh. 12.) Ms. Motakef stated in the letter that the WHOA board was acting too harshly against Dr. Kabir in connection with a debt he owed, and that Ms. Motakef disagreed with a suggestion by WHOA president Miguel Martinez to "put a lien on" Dr. Kabir's property to address Dr. Kabir's failure to address his

1  "delinquent account." (*Id.*) Ms. Motakef said the board should not commence

2  collection procedures or put a lien on Dr. Kabir's property, but instead send him a

3  letter to resolve the matter informally. (*Id.*) Finally, Ms. Motakef stated that Mr.

4  Uffleman had "taken a hostile attitude" towards Ms. Motakef since learning that

5  Dr. Kabir "happens to have the same nationality as I do," and recommended that

6  all future board meetings be taped. (*Id.*)

7

8       On October 26, 1998, Mr. Motakef wrote a letter to Mr. Uffleman

9  responding to Mr. Uffleman's September 28, 1998 letter.  (Defendants' Exh., 13.)

10  Mr. Motakef reiterated his concerns with the four issues outlined in the September

11  28 letter, and expressed dissatisfaction with Mr. Uffleman's response. (*Id.*) He

12  asked that the management make an "on site inspection" of the Sachdevs' air

13  conditioning unit, remove the wrought iron fence and fix the drainage problem,

14  and inspect the property to determine if the Sachdevs' trees and plants "constitute

15  a violation of the view fencing regulations, pertaining to the CC&Rs." (*Id.*) The

16  letter also stated that "the management sent Mr. Miguel Martinez, the President of

17  the Board, to the site, and according to Mrs. Sachdev, recommended her to install

18  lattices and plant more vines against the fence, without any Architectural

19  Approval, which has caused a greater water blockage problem in her drainage

20  path." (*Id.*) The letter also objected to a deck that the Sachdevs apparently had

21  built, and stated that the deck obstructed the Motakefs' view, was a "fire hazard,"

22  and had been built without "Architectural Approval." (*Id.*) Finally, Mr. Motakef

23  accused the board of failing to respond to the Motakefs' complaints about Mrs.

24  Havel. (*Id.*) Mr. Motakef wrote a letter on December 3, 1998 to Mr. Sachdev,

25  copied to attorney Fay Arghavani, stating that "a leak through some of your pipes

26  beside your air conditioner" had caused a leak onto the Motakefs' property.

27  (Defendants' Exh. 14.)

28

1    Correspondence between the Motakefs and Mr. Uffleman continues through
2    2001.  In the letters, Mr. Motakef complains that the WHOA board has entered his
3    property without notice or his consent to inspect trees on the slope, cites alleged
4    "ego, resentment, hostility, ...emotion... [and] prejudice" by Mr. Uffleman, and
5    continues to complain about the iron fence, view obstruction from the Sachdevs'
6    hedges, and water drainage from the Sachdevs' property. (Defendants' Exhs. 16,
7    17.)  The Motakefs also stated that the WHOA board was failing to maintain the
8    slope area behind their house and failing to respond to their concerns., and in a
9    June 20, 1999 letter to WHOA board member Linda Hollingsworth, cited specific
10   CC&R sections the Motakefs believed the association was violating with regard to
11   drainage and architectural improvements by other homeowners. (Defendants' Exh.
12   18.)  Minutes of a June 22, 1999 WHOA board meeting reflect that Ms. Motakef
13   was present at the meeting and raised her concerns regarding slope maintenance,
14   view restrictions, fencing, property lines, and water drainage.  (Defendants' Exh.
15   19.)  According to the minutes, "[t]he Board stated they will review [Ms.
16   Motakef's] concerns at the next walkthrough and these matters will be discussed at
17   the next Board meeting." (*Id.*)  Minutes of a July 27, 1999 meeting reflect that
18   Ms. Motakef again raised the same concerns. (Defendants' Exh. 20.)  They state
19   that the air conditioning issue was resolved by an Anaheim City inspection, the
20   issue of the wrought-iron fence is "not an Association issue" and must be resolved
21   by the Motakefs and the Sachdevs, that the Sachdevs agreed to have a water test to
22   resolve the drainage issue, and that the view obstruction issue must be
23   "compromised by the 2 homeowners." (*Id.*)  The board said it would write a final
24   letter to Ms. Motakef "answering each of her concerns." (*Id.*)  Minutes of an
25   August 24, 1999 WHOA board meeting reflect that Ms. Motakef raised the same
26   concerns as in the last meeting and that the Board "reviewed a sample final letter"
27   to her but did not approve it. (*Id.*, Exh. 21.)  The WHOA board sent a final letter
28   to Ms. Motakef on September 15, 1999, addressing seven concerns she had raised.

1  (Defendants' Exh. 22.)  The letter stated, *inter alia*, that Ms. Motakef could bring

2  a "liability claim" relating to the water drainage issue, that the Motakefs were

3  entitled to trim any tree branches that encroached on their property, and that a

4  letter would be sent to Mrs. Havel asking her to remove a damaged retaining wall

5  to which the Motakefs had objected.  (*Id.*)  The letter concluded by saying that

6  "this is the final decision of the Board.  There will be no further discussion of any

7  of these topics in future Board meetings."  (*Id.*)

8

9       The final letter apparently did not resolve the Motakefs' disputes with the

10  board, however.  Minutes of a January 25, 2000 meeting reflect that Mr. Motakef

11  raised "concerns" in the meeting and was advised to "contact the Association's

12  attorney" if he wished "to challenge any of the Board's position statement."

13  (Defendants' Exh. 23.)  On January 17, 2001, Ms. Motakef wrote a letter to Mr.

14  Uffleman complaining of damage to a "block wall" on the Motakef's property and

15  problems with drainage.  (Defendants' Exh. No. 26.)  The letter cites alleged

16  "continuous discrimination and harassment from the Board" and warns "this is my

17  last notice to the board in an attempt to have the Board resolve this matter.

18  Otherwise, I will be forced to pursue this matter legally."  (*Id.*)  The next day,

19  January 18, 2001, Ms. Motakef sent Mr. Uffleman an e-mail complaining that the

20  WHOA had failed properly to maintain vegetation and trees on the Motakef's

21  slope and "v-ditch."  (Defendants' Exh. 28.)  The letter stated that it had been

22  eight months since the Motakefs' slope had received attention from the landscaper,

23  the vegetation on the slope was overgrown, and a damaged tree was leaning on the

24  Motakefs' wall.  (*Id.*)  The e-mail also accused Mr. Uffleman of "protect[ing] the

25  interests of a special group of people who encourage your own interests" and

26  giving out special treatment and superior slope maintenance to favored board

27  members.  (*Id.*)  Mr. Uffleman sent an undated responsive letter to Ms. Motakef,

28  stating that the retaining wall and wrought iron fence were an "individual

1 homeowner responsibility," not a board responsibility, that the Motakef's slope

2 "receives the same care as every other member's slope in the Association," and

3 that Ms. Motakef's "comments regarding favoritism is [sic] completely false."

4 (Defendants' Exh. 29.)

5

6      On April 24, 2001, Ms. Motakef asked the WHOA to engage in alternative

7 dispute resolution with her. (Defendants' Exh. 33.) On May 9, 2001, Mr.

8 Uffelman sent Ms. Motakef a letter asking that she write a letter setting forth the

9 reasons for her request. (Defendants' Exh. 34.) On August 25, 2001, Ms.

10 Motakef sent a letter to Mr. Uffelman stating that the board had ignored her

11 family's concerns regarding the Sachdevs and the Havels, and had taken a

12 "discriminatory and indifferent position toward our concerns and the unresolved

13 issues with our neighbors." (Defendants' Exh. No. 35.) The letter stated that the

14 association had ignored several requests by the Motakefs for cleaning of their "v-

15 ditches," and accused Mr. Uffelman and the board of attempting to "get rich" by

16 foreclosing on the property of another association member, Mr. Mirasoltani,

17 "without any due process for a few hundred dollars' assessment fee." (*Id.*) In

18 addition, the letter stated that Mr. Uffelman had "taken a hostile attitude towards

19 [Ms. Motakef] ever since it has come to [his] attention that Mr. Kabir [another

20 association member] and [Ms. Motakef] happen to have the same nationality."

21 (*Id.*) The letter concluded by stating, "[l]ife has become so unbearable in this

22 neighborhood for us, which has greatly affected our health and the enjoyment of

23 our property," and threatened to take legal action "if I do not receive any

24 immediate attention from the board to resolve these issues." (*Id.*) Ms. Motakef

25 apparently sent an identical letter to Mr. Uffelman on December 31, 2001. (*Id.*)

26

27

28

1

**B.**    **Harassment by Neighbors, Maintenance Issues, and Board**

2

**Inaction**

3

4          Ms. Motakef alleges that the WHOA repeatedly failed to address

5     maintenance issues she posed at board meetings, provided her with substandard

6     slope maintenance and services, and encouraged her neighbors to harass her

7     family because her family is Iranian.  She states she "had to call the police several

8     times while I was a WHOA member, to protect me and my family from the

9     harassment, intimidation, discrimination and threats we received from non-Iranian

10    WHOA Members." (Motakef Decl., ¶ 7.)  The board was made aware of the

11    threats, she says, but "refused to enforce the CC&Rs and resolve these issues."

12    (*Id.*)  She states "WHOA Board member and WHOA Members continue to this

13    day to harass, discriminate[] against, threaten, annoy, intimidate and terrorize me

14    and my family," and that the WHOA board "is aware of this."  (*Id.*, ¶ 9.)  She also

15    states that she "believe[s] that WHOA Board members, including Miguel

16    Martinez, gave instructions to my neighbors which resulted in further acts of

17    harassment, threats, acts of violence, discrimination and annoyance directed at me

18    and my family." (*Id.*, ¶ 10.)

19

20         Ms. Motakef and her husband describe numerous incidents of harassment

21    by the Havels and the Sachdevs.  Both neighbors, Mr. Motakef states, spread

22    rumors that Ms. Motakef was "bad" and "crazy," and made ridiculing and

23    derogatory remarks to the Motakefs.  (Jahan Motakef Depo., 28:18-29:9.)  Mr.

24    Motakef also states that the Sachdevs and/or the Havels called members of his

25    family "a crazy person, follower of Khomeini or Khomeini's daughter," and told

26    his family to "go back to your country." (*Id.*, 29:18-23.)  Ms. Havel's daughter,

27    he states, once parked a car in front of the Motakefs' house in the middle of the

28    night "against the traffic ... [in] an intimidating fashion" and, when Mr. Motakef

asked her why she had parked the car there, "screamed and yelled that we have to move ... out of the neighborhood [and] [w]e don't belong to this neighborhood." (*Id.*, 30:10-23.) He further states that Ms. Havel's son "scream[ed] at my children and us[ed] the F word." (*Id.*, 35:19-21.) Another time, Ms. Havel and a friend walked across the Motakefs' lawn and caused a disturbance so significant that Ms. Motakef had to call the police. (*Id.*, 42:9-25, 45:2-6.) One time, Ms. Havel's grandson came onto the Motakefs' property and attempted physically to attack the Motakefs' son. (Mehri Motakef Depo., 112:7-14.)

Mr. and Ms. Motakef also describe harassment by the Sachdevs. On one occasion, Mr. Sachdev threatened to kill the Motakef's son's pet bird that he had for a science project. (Jahan Motakef Depo., 51:15-21.) Mr. Sachdev also threatened physical violence against the Motakefs' children, and intimidated their daughter by threatening to strangle her. (*Id.*, 52:5-25; 53:2-5.) On at least one occasion, the Sachdevs "sent the[ir] dog after [the Motakefs'] daughter when she was bicycling on the street." (*Id.*, 83:20-22.) Mr. Motakef told the WHOA about the harassment, but "nothing came of it." (*Id.*, 56:1-11.) Mr. Uffleman told Ms. Motakef that the harassment was "not [an] association matter, [but] a civil matter, and ... to call the police." (Mehri Motakef Depo., 100:21-25.)

Ms. Motakef states that Mr. Uffelman made discriminatory comments about Iranians and exhibited a discriminatory attitude towards Iranians in WHOA board meetings. Mr. Uffelman "told [Ms. Motakef] [she] could not speak at WHOA board meetings," and that "the [Motakefs'] outstanding issues with the Sachdevs ... are considered by the WHOA and Jerry Uffelman to be closed issues which the WHOA will not address/rectify." (*Id.*) The board asked another Iranian member, Esmail Nabi, to resign. (Plaintiff's Exh. D, No. 23.) Mr. Uffelman also made several comments to Ms. Motakef regarding her ethnicity. Once when Ms.

Motakef called Mr. Uffelman to complain about her neighbors, Mr. Uffelman told her "you think you are Khomeini and you want to do the same thing here," that "you cannot do things that you were doing back home," called her "manipulating," and said she "harass[ed] everyone" and "[gave] hard time[s] to your neighbor" and told her "you are living here, things are different, you have to change yourself," "you think you are gorgeous, and you don't know what to do." (*Id.*, 74:6-21; 75:17-18.) One time, while Mr. Uffelman was talking to Ms. Motakef about Iranian homeowner Dr. Kabir, Mr. Uffleman told Ms. Motakef he had seen a movie with Iranian characters in it and asked her if all Iranian men were "like [that]," *i.e.* "uneducated" people who use "profane language," "beat their wives," and are "just kind of crazy." (Mehri Motakef Depo., 49:23-52:18.)

Ms. Motakef also states that the WHOA board did not respond to her maintenance requests as quickly or thoroughly as it did to non-Iranian residents' requests. Ms. Motakef states that "[d]uring at least the two to three years prior to the time I filed my Complaint in this action, and to the present, I have observed that when I made service and maintenance requests to have the upslope behind my home maintained, my upslope did not receive the same care as every other WHOA Member's slope. Instead, my requests were frequently ignored." (*Id.*, ¶ 25.) She also states that the WHOA failed to address problems with debris and algae in her swimming pool, which clogged the pool filter. (Motakef Decl., ¶ 35.) The board denied her requests for pool maintenance while approving requests for pool maintenance by other, non-Iranian WHOA members. (Plaintiff's Exh. D, No. 559.) Ms. Motakef submits a document entitled "Agenda," which appears to be the minutes of a WHOA meeting on July 24, 2001. (Exh. D., No. 7370.) The document states that tree trimming was requested by the Motakefs "back in May"

1  but has not been done.  (*Id.*)[3]  Other WHOA meeting minutes reflect that the board

2  approved various non-Iranian WHOA members' requests for reimbursement for

3  tree removal.  (Exh. D, No. 5615.)

4

5  ### C.   WHOA's Dealings with Other Iranian Homeowners

6

7       In support of her claim that the WHOA discriminated against Iranian

8  homeowners, Ms. Motakef presents evidence regarding the WHOA's dealings

9  with Iranian homeowners Dr. Yonas Kabir and a family named the Mirasoltanis.

10  On November 1, 2002, the WHOA recorded a Notice of Delinquent Assessment

11  against Mr. Mirasoltani for failure to pay his association dues.  (Plaintiff's Exh. D,

12  No. 713.)  A document entitled "status report for Woodcrest Homeowners'

13  Association," dated August 31, 2000, lists Mr. Mirasoltani's name and states

14  "Lien Notice Recorded on 7-31-00," and "No response from Debtor...We may

15  commence foreclosure after 09-01-00."  (Exh. D, No. 6473.)  A letter dated

16  September 6, 2000 to the WHOA from Coast Assessment Service Company states

17  that the company has "instituted foreclosure proceedings of" Mr. Mirasoltani's

18  property, and that Mr. Mirasoltani "is allowed three full months after the recording

19  date of [the] Notice of Default to reinstate his ... account before we will be able to

20

---

21       [3] Defendants submit several documents into evidence that appear to be complaints

22  filed by non-Iranian WHOA members, regarding the WHOA's failure to maintain their
    pools and/or maintain the slopes behind their homes.  (Defendants Exhs. 24, 30.)

23  However, these complaints are hearsay to the extent they are offered to prove that the
    WHOA in fact did not clean the non-Iranian members' pools on time.  *See* FED. R. EVID.

24  801(c)(defining "hearsay" as "a statement, other than one made by the declarant while

25  testifying at the trial or hearing, offered in evidence to prove the truth of the matter
    asserted.")  The Court therefore will not consider the complaints for that purpose.  For the

26  same reason, the Court will not consider for their truth various letters submitted into

27  evidence by Ms. Motakef that she and/or Mr. Motakef wrote to the WHOA about
    maintenance problems they were having with their house and other issues relating to the

28  WHOA board, Mr. Uffelman, and their neighbors.

14

take any further action." (*Id.*, No. 6474.) The delinquent assessment notice was released on December 11, 2001, after Mr. Mirasoltani paid the overdue amounts. (*Id.*)   As to Dr. Kabir, Ms. Motakef alleges the WHOA discriminated against him by failing to clean the slope behind his house and suing him to force him to remove a satellite television dish he had installed.  (Motakef Decl., ¶ 6.)  She states in her declaration that the WHOA board did not similarly sue "other non-Iranian Members who had installed satellite dishes." (*Id.*, ¶ 6.)

## II.   Motion for Summary Judgment

### A.   Applicable Standard on a Motion for Summary Judgment

A court may award summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  In making a summary judgment determination, the Court must view the evidence presented in the light most favorable to the non-moving party, drawing "all justifiable inferences . . . in his favor." *Id.* at 255.

The moving party in a summary judgment motion bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).  If the moving party makes this initial showing, the nonmoving party must "designate 'specific

1   facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324

2   (citation omitted).  Where the non-moving party bears the burden of proof at trial

3   on an element essential to its case, that party must make a showing sufficient to

4   establish a genuine issue of material fact with respect to the existence of that

5   element in order to avoid summary judgment. *Id.* at 322-23.  To defeat a summary

6   judgment motion, the opponent may not rely on the pleadings, but must

7   affirmatively come forth with sufficient evidence to substantiate its claims or

8   defenses. *Id.* at 324.  Thus, the Court must determine whether, believing the

9   evidence submitted by Ms. Motakef and drawing all justifiable inferences in her

10  favor, any genuine issues of material fact exist regarding the merits of her claims.

11

12       **B.     56(f) Application**

13

14       Ms. Motakef's opposition brief includes what essentially is a motion under

15  Federal Rule of Civil Procedure 56(f) for leave to conduct additional discovery.

16  She alleges that Defendants failed to produce certain documents requested in

17  discovery, and that certain depositions remain to be taken or are incomplete.

18  However, she does not state what information she hopes to gain from the cited

19  documents or depositions, or explain how any such information would relate to

20  her motion.

21       Federal Rule of Civil Procedure 56(f) provides:

22

23       Should it appear from the affidavits of a party opposing [a] motion

24       [for summary judgment] that the party cannot for reasons stated

25       present by affidavit facts essential to justify the party's opposition, the

26       court may refuse the application for judgment or may order a

27       continuance to permit affidavits to be obtained or depositions to be

28       taken or discovery to be had or may make such other order as is just.

A party moving for additional discovery under Rule 56(f) must "make clear what information is sought and how it would preclude summary judgment." *Garrett v. City and County of San Francisco*, 818 F.2d 1515, 1518 (9th Cir. 1987). Ms. Motakef has failed to meet this standard because she has not stated what evidence she believes she will gain from the deposition testimony of the individuals listed in her opposition or the documents she seeks to have Defendants produce, or explain how that evidence would preclude summary judgment. The Court notes that Ms. Motakef has moved for additional discovery in response to Defendants' summary judgment motion once before, in an *ex parte* application filed on April 26, 2006 in lieu of an opposition to the motion. (Court Docket No. 71.) In an order addressing that application, dated May 2, 2006, the Court stated that Ms. Motakef had failed to meet the standard required for additional discovery under Rule 56(f). (Court Order re Ex Parte Application, May 2, 2006; Court Docket No. 73.) The Court gave Ms. Motakef additional time to file an opposition to the summary judgment motion, and instructed her on the appropriate standard under Rule 56(f). (*Id.*) Although Ms. Motakef has now filed an opposition and has renewed her request for additional discovery, she still has failed to state what information she believes she will gain from the additional discovery she seeks or how it would preclude summary judgment. Consequently, the Court will deny Plaintiff's application for additional discovery and proceed to rule on Defendants' summary judgment motion.

## C.   Statutes of Limitations

Defendants first argue that all of Ms. Motakef's claims are time-barred because she knew the basis for them no later than 1998, but did not sue until 2003. According to Defendants, all of Ms. Motakef's claims have statutes of limitation

of between one and three years.  Ms. Motakef argues that her claims were timely

under the "continuing violation" doctrine because the alleged discrimination and

harassment of which she complains continued through the date her Complaint was

filed.  The continuing violation doctrine permits a plaintiff to bring a claim based

on a "practice" composed of a series of acts, such as a hostile work environment,

at any time within the limitations period measured from any act that is part of the

practice.  *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16,

122 S.Ct. 2061 (2002)("Given...that the incidents constituting a hostile work

environment are part of one unlawful employment practice, the employer may be

liable for all acts that are part of this single claim. ... [I]n order for the charge to be

timely, the employee need only file a charge within [the limitations period] of any

act that is part of the hostile work environment."); *O'Conner v. City of Newark*,

440 F.3d 125, 127 (3rd Cir. 2006)(applying distinction between discrete acts and

ongoing "practices," set forth in *Morgan*, a title VII case, to a claim under 42

U.S.C. § 1983); *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1061 (9th Cir.

2002)("[D]iscrete discriminatory acts are not actionable if time barred, even when

they are related to acts alleged in timely filed charges.")

Regardless of whether Ms. Motakef's claims qualify as a continuing

"practice" under *Morgan*, the Court construes her declaration to state that the

conduct of which she complains continued through October 20, 2003, the date she

filed her Complaint.   Thus, Ms. Motakef's claims are not time barred except to the

extent they rest on acts committed outside their respective limitations periods,

measured backwards from October 20, 2003.  Even so, under Defendants'

reasoning Ms. Motakef's claims for negligent supervision, "neglect to prevent

violation of civil rights" under 42 U.S.C. § 1986, and violation of Civil Code

sections 51 and 51.5 still would be time-barred as to Gold Coast and Mr. Uffleman

because Defendants contend those claims have one-year limitations periods and

1    the parties agree that WHOA and Mr. Uffleman ceased working for Woodcrest

2    over a year before Ms. Motakef filed her Complaint. (Plaintiff's Statement of

3    Undisputed Facts, No. 42.)[4]  The parties do not dispute that the Civil Code

4    sections 51 and 51.5 and negligent supervision claims are governed by the statute

5    of limitations for personal injury actions contained in former Code of Civil

6    Procedure section 340(3).[5]  *See also Gatto v. County of Sonoma*, 98 Cal. App. 4th

7    744, 759-60 (2002)(claims under Civil Code section 51 carry a one-year statute of

8    limitations); *Chaney v. Superior Court*, 39 Cal. App. 4th 152, 155 (1995)("The

9    limitations period applicable to a cause of action for negligence is one year

10   [pursuant to Code of Civil Procedure section 340(3)].").

11

12        Former Code of Civil Procedure section 340(3) does not bar the section 51

13   and 51.5 or negligent supervision claims against Mr. Uffelman and Gold Coast.  In

14   2002, the California Legislature extended the statute of limitations for personal

15   injury actions from one to two years effective January 1, 2003, by enacting Code

16   of Civil Procedure section 335.1.  Although section 335.1's two-year period does

17   not apply retroactively to claims that had lapsed before January 1, 2003, it does

18   apply to claims that were not barred as of that date under the previously-applicable

19   limitations period. *Krupnick v. Duke Energy Morro Bay, LLC*, 115 Cal. App. 4th

20   1026 (2004)(Section 335.1 does not apply retroactively to claims that had lapsed

21   as of January 1, 2003); *Andonagui v. May Dept. Stores Co.*, 128 Cal. App. 4th 435

22

23   _____

24        [4] Ms. Motakef states that Mr. Uffelman and Woodcrest continued to "conduct the
     daily management and maintenance of Woodcrest" until June 25, 2002. (Plaintiff's

25   Statement of Genuine Issues, No. 6.) She filed her Complaint on October 20, 2003.

26        [5] The Court is not aware of, and the parties have not cited, any authority for the
     proposition that the statute of limitations applicable to claims under Civil Code section

27   51.5 is not the same as that applicable to claims brought under Civil Code section 51.  As
     the parties do not contest that the periods are the same, the Court will not address the

28   issue in this Order.

(2005)(claims that were not time-barred as of January 1, 2003 receive the benefit of Section 335.1's two-year statute of limitations).  As Ms. Motakef's claims against Mr. Uffleman and Gold Coast are based on conduct occurring through June 25, 2002 at the latest, former Section 340(3)'s one-year limitation period had not elapsed on those claims as of January 1, 2003.  Therefore, the claims for violation of Civil Code sections 51 and 51.5 and negligent supervision receive the benefit of Section 335.1's two-year limitation period and are not barred.

Ms. Motakef's "neglect to prevent violation of civil rights" claim, however, is barred as to Mr. Uffelman and Gold Coast because 42 U.S.C. § 1986 contains a limitations period of one year.  42 U.S.C. § 1986 (" [N]o action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.")  Under federal law, "a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Azer v. Connell*, 306 F.3d 930, 936 (9th Cir. 2002).  Ms. Motakef's evidence establishes that she knew of the alleged ongoing discrimination by Mr. Uffelman and Gold Coast at all times between 1998 and October 20, 2003.  Thus, her section 1986 claim accrued at the time of the alleged wrongdoing.  As any such wrongdoing by Mr. Uffelman or Gold Coast had to have occurred more than one year before Ms. Motakef's Complaint was filed, and Ms. Motakef does not argue that the limitation period should be tolled, her section 1986 claim is barred.  The Court consequently will grant summary judgment of Ms. Motakef's section 1986 claim in favor of Mr. Uffelman and Gold Coast.

## D.   Evidence Supporting Ms. Motakef's Claims

In addition to their statutes of limitation arguments, Defendants argue that Ms. Motakef has failed to present sufficient evidence to create triable issues of

fact on her claims.  As explained below, Ms. Motakef has failed to present
sufficient evidence to sustain any of her claims except for those against all
Defendants pursuant to Civil Code sections 51 and 51.5 and California Business
and Professions Code section 17200, and for negligent supervision against WHOA
and Gold Coast.  Because the Court is granting summary judgment in favor of
Defendants on all of Ms. Motakef's federal claims, the Court will dismiss the
remaining state claims.

### 1.    Federal Fair Housing Act

Defendants argue that Ms. Motakef's claims pursuant to sections 3604 and
3617 of the federal Fair Housing Act ("FHA"), 42 U.S.C. §3601 *et seq.*, fail
because the FHA does not apply to discriminatory acts that occur after property
has been purchased or rented.   They further argue that, even if sections 3604 and
3617 did apply, Ms. Motakef has failed to present evidence of sufficiently
egregious discrimination to give rise to a FEHA claim.  Finally, Defendants argue
that Ms. Motakef has not presented evidence that Defendants discriminated in the
provision of slope maintenance or other services.

The federal Fair Housing Act, 42 U.S.C. §3601 *et seq.*, reflects a policy of
"provid[ing], within constitutional limitations, for fair housing throughout the
United States." 42 U.S.C. § 3601.  The FHA prohibits "discriminatory housing
practice[s]," which are defined as acts that violate 42 U.S.C. sections 3604, 3605,
3606, or 3617.  42 U.S.C. § 3602(f).  Section 3604 states that it is "unlawful:"

(a) To refuse to sell or rent after the making of a bona fide offer, or to
refuse to negotiate for the sale or rental of, or otherwise make
unavailable or deny, a dwelling to any person because of race, color,

religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

Section 3617, in turn, prohibits "coerc[ing], intimidat[ing], threaten[ing], or interfer[ing] with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed ... any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. §3617.

### a.    42 U.S.C. § 3604

Defendants argue that Ms. Motakef has no claim under section 3604 because that section only governs discrimination in connection with "sale or rental of a dwelling" and Ms. Motakef already had purchased her house before the discrimination began. Ms. Motakef argues that her claim is validly brought for discriminatory "provision of services related to real estate," and that "failure to provide [such] services ... is a proper claim under the Fair Housing Act." (Opposition p.15.) As Ms. Motakef does not argue that her claim is for "mak[ing] unavailable or den[ying] a dwelling," under section 3604(a),[6] the Court will

---

[6] Ms. Motakef's Second Amended Complaint asserted a claim under section 3604(a), alleging that "Defendants refused to lease, rent, sell or provide services to people of Iranian origin ... after those people made bona fide offers to lease, rent or sell and/or were entitled to services regarding dwelling units at Woodcrest." (Second Amended Complaint, ¶ 39.) However, she appears to have abandoned her section 3604(a) claim

1  address only whether she has a claim under section 3604(b).

3       The Ninth Circuit has not addressed whether section 3604(b) applies to
4  provision of services after the initial sale or rental transaction, and courts from
5  other circuits are split on the issue. *Compare Cox v. City of Dallas, Texas*, 430
6  F.3d 734 (5th Cir. 2005)(section 3604(b) only prohibits discriminatory provision
7  of services or facilities in connection with sale or rental of a dwelling) *and*
8  *Halprin v. Prairie Single Family Homes of Dearborn Park Assn.*, 388 F.3d 327
9  (7th Cir. 2004)(same) *with Lopez v. City of Dallas*, 2004 WL 2026804 (N.D. Tex.
10 Sept. 9, 2004)(section 3604(b) applies to discriminatory provision of municipal
11 services after sale or rental) *and Jersey Heights Neighborhood Ass'n v.*
12 *Glendening*, 174 F.3d 180, 192 (4th Cir. 1999)("[section 3604(b)'s] services
13 provision simply requires that 'such things as garbage collection and other
14 services of the kind usually provided by municipalities' not be denied on a
15 discriminatory basis."). The disagreement centers on whether the word
16 "therewith" in section 3604(b)'s phrase "the provision of services or facilities in
17 connection *therewith*" refers to "sale or rental of a dwelling" or simply to the word
18 "dwelling."

21      The Department of Housing and Urban Development ("HUD"), the agency
22 empowered to interpret the FHA and promulgate regulations relating to it, has
23 passed a regulation interpreting section 3604(b). That regulation, 24 C.F.R.

---

25 because she does not make any argument based on section 3604(a) in her opposition. In
26 any event, any section 3604(a) claim could not be sustained because Ms. Motakef
   presents no evidence that Woodcrest refused to rent or sell any dwelling to, or otherwise
27 made housing unavailable to, her or any other persons of Iranian descent. She also does
28 not argue that she has third-party standing to assert claims on behalf of other persons
   allegedly denied housing by Defendants.

§100.65 (2004), states in relevant part:

> a) It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to impose different terms, conditions or privileges relating to the sale or rental of a dwelling or to deny or limit services or facilities in connection with the sale or rental of a dwelling.

> (b) Prohibited actions under this section include, but are not limited to:
>
> ...

> (4) Limiting the use of privileges, services or facilities associated with a dwelling because of race, color, religion, sex, handicap, familial status, or national origin of an owner, tenant or a person associated with him or her.

In *Lopez v. City of Dallas*, the court observed that 24 C.F.R. §100.65(a) interprets section 3604(b)'s word "therewith" to refer to "the sale or rental of a dwelling" rather than the dwelling itself. *Lopez*, 2004 WL 2026804 *8. However, the court noted, subsection (b)(4) of the regulation interprets discrimination "in connection with the sale or rental of a dwelling" to include restricting the "privileges, services or facilities associated with a dwelling." *Id.* The court then applied the standard of review for agency interpretations of statutes set forth in *Chevron v. Natural Res. Defense Council*, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed. 2d 694 (1984). Under that standard, the *Lopez* court held that Congress had not directly spoken to the issue whether section 3604(b) applies to post-sale or rental discrimination in the provision of services or facilities, and that HUD's interpretation was reasonable. *Id.* at *9. Thus, the Court held that section

1  3604(b) prohibits discriminatory provision of services or facilities "associated

2  with a dwelling" rather than just those associated with sale or rental of a dwelling.

3  *Id.* This Court adopts *Lopez'* persuasive reasoning and holds that section 3604(b)

4  applies to discriminatory provision of privileges, services and facilities associated

5  with a dwelling.

6

7      The question remains, however, whether homeowner association services

8  such as landscaping and pool cleaning are "privileges, services or facilities

9  associated with a dwelling" within the meaning of 24 C.F.R. §100.65. The Court

10  does not believe they are. Even the cases that have held section 3604(b)

11  applicable to discrimination after the initial sale or rental transaction have limited

12  the statute's reach to the most basic services, such as garbage collection and other

13  services normally provided by municipalities. *See Jersey Heights*, 174 F.3d at

14  192. In *Cox v. City of Dallas*, the Fifth Circuit cautioned against interpreting the

15  FHA so broadly as to make it into "a general anti-discrimination pose, creating

16  rights for any discriminatory act which impacts property values." *Cox*, 430 F.3d at

17  746. Although HUD has interpreted section 3604(b) to extend to post-sale or

18  rental services, that interpretation must be reconciled with the fact that Congress'

19  primary concern in enacting the FHA was to ensure the *availability* of housing,

20  rather than to prevent discriminatory acts once housing already has been obtained.

21  *See Halprin*, 388 F.3d 327("Behind the [FHA] lay the widespread practice of

22  refusing to sell or rent homes in desirable residential areas to members of minority

23  groups. Since the focus was on [minorities'] exclusion, the problem of how they

24  were treated when they were included...was not at the forefront of congressional

25  thinking.") To limit section 3604(b) to basic municipal services would comport

26  with Congress' purpose of ensuring the availability of housing without converting

27  the FHA into a general prohibition on discrimination: whereas discriminatory

28  failure to provide basic sanitation services would as a practical matter preclude

minority residents from living in affected areas, failure to provide landscaping and pool cleaning services cannot be said to make housing unavailable in any meaningful sense.  Consequently, the Court holds that Ms. Motakef's claims for discriminatory provision of landscaping and other homeowner services are not cognizable under 42 U.S.C. §3604(b).[7]

**b.**    **42 U.S.C. § 3617**

Ms. Motakef also brings a claim for discrimination and harassment under 42 U.S.C. § 3617.  HUD has passed a regulation that interprets that section to forbid "threatening, intimidating, or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons."  24 C.F.R. §100.400(c)(2). The regulation's language has been held to "cut[] section 3617 loose from section 3604, contrary to the language of section 3617," which

---

[7] Ms. Motakef cites *Dunn v. Midwestern Indemnity Mid-American Fire and Casualty Company*, 472 F.Supp. 1106 (S.D. Ohio 1979) for the proposition that post-sale-or-rental discrimination is actionable under section 3604(b).  However, *Dunn* is distinguishable because it was decided under 42 U.S.C. § 3604(a) rather than § 3604(b), and rested on a finding that the challenged practice, insurance redlining, would in effect prohibit individuals from obtaining housing. *Dunn*, 472 F. Supp. at 1109 ("[T]he availability of appropriate insurance is a necessary predicate to the availability of financing, and financial assistance is a precondition to securing the availability of adequate housing.")  Here, by contrast, Ms. Motakef does not argue that Defendants engaged in any practice that would prohibit her from obtaining housing. Nor does she present evidence of acts sufficient to rise to the level of "constructive eviction," which has been held adequate to state a claim under section 3604(b). *See, e.g., Cox*, 430 F.3d at 746 ("[Section] 3604(b) may encompass the claim of a current owner or renter ... for actual or constructive eviction.")  That Ms. Motakef is not proceeding on a constructive eviction theory is apparent:  although she states in her deposition that she temporarily vacated her home on two occasions due to frustration with the drainage, air conditioning noise, and "dealing with the neighbor," her declaration states that she still lives in Woodcrest with her family. (Mehri Motakef Depo., 107:20-25; Mehri Motakef Decl., ¶ 3.)

otherwise would appear to require an underlying violation of section 3604 or some other section of the FHA. *Halprin*, 388 F.3d at 330. *But see Frazier v. Rominger*, 27 F.3d 828, 834 (2nd Cir. 1994)(holding that section 3617 requires a violation of Sections 3603-3606.)  Section 3617 prohibits "discriminatory conduct which is designed to drive the individual out of his or her home," such as abusive racially-motivated epithets or other intimidating behavior directed at a resident because of protected class status. *Egan v. Schmock*, 93 F. Supp. 2d 1090, 1093 (N.D. Cal. 2000)(racial epithets and harassment directed at East Indian family by neighbors were sufficient to state a claim under section 3617, provided plaintiffs alleged that the defendants acted with the intent to drive plaintiffs out of their home.)

Ms. Motakef presents evidence that her neighbors, the Havels and the Sachdevs, engaged in conduct within the ambit of section 3617.  According to Ms. Motakef, both sets of neighbors threatened the Motakefs with physical violence and engaged in a pattern of abuse and harassment that included calling them "follower[s] of Khomeini" and telling them to "go back to your country."  These allegations are more than sufficient to permit a jury to find that the neighbors intended to drive the Motakefs from their homes.  Consequently, the evidence presented is sufficient to make out a claim under section 3617.

The problem, however, is that none of the Motakefs' neighbors are named as defendants.  Moreover, there is no evidence that any of the parties who are named as defendants did anything to harass, threaten, or intimidate the Motakefs. Ms. Motakef does not allege that Mr. Uffelman, Gold Coast, or the WHOA engaged in any abusive conduct, threats, or intimidation, but merely speculates that she is "informed and believe that the WHOA Board members supported WHOA Members in their efforts to harass, threaten, annoy and intimidate and terrorize me and my family." (Mehri Motakef Decl., ¶ 11.)  That statement of

"belief" is unsupported by evidence.  Although Ms. Motakef alleges that Mr. Uffleman "had cocktails" with her neighbors (Mehri Motakef Decl., ¶ 14), such socialization does not constitute participation in or encouragement of the threatening or intimidating acts.  Nor does the fact that the WHOA failed to attempt to correct the neighbors' harassment after the Motakefs complained.  According to Ms. Motakef, Mr. Uffleman told her to call the police when she reported the harassment to him, and stated that it was a "police matter" and not an "association matter."  (Mehri Motakef Depo., 100:21-25.)   Although Mr. Uffleman made several offensive comments to Ms. Motakef, including telling her "you can't do things like you do at home" and asking if Iranian men are "crazy" or "uneducated" or "beat their wives," there is no evidence that these comments were intended to threaten Ms. Motakef or cause her to move.  In sum, there is no evidence to support liability under section 3617 on the part of any of the Defendants.

　　　For the foregoing reasons, the Court will grant summary judgment in Defendants' favor on Ms. Motakef's claims under the Fair Housing Act, sections 3604 and 3617.

## 2.　　Civil Code Sections 51 and 51.5

　　　California Civil Code sections 51 and 51.5 prohibit discrimination by "business establishments" in connection with sales and/or the provision of services to customers.  Defendants argue that Ms. Motakef's section 51 and 51.5 claims fail because she has presented no evidence that Defendants discriminated against her based on her national origin.  Ms. Motakef argues that Defendants discriminated against her by ignoring her maintenance requests and providing her substandard services because she is Iranian.

Sections 51 and 51.5 provide in relevant part:

All persons within the jurisdiction of this state are free and equal, and no matter what their ... national origin ... are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

CAL. CIV. CODE § 51(b).

(a) No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51 ... because the person is perceived to have one or more of those characteristics, or because the person is associated with a person who has, or is perceived to have, any of those characteristics.

CAL. CIV. CODE § 51.5(a).

Ms. Motakef has presented sufficient evidence to defeat summary judgment on her Civil Code sections 51 and 51.5 claims against all Defendants. She states that the WHOA and Gold Coast, through Mr. Uffelman, exhibited discriminatory animus against Iranian residents, as demonstrated by the WHOA's attempt to foreclose on the Mirasoltani's house for a debt of just a few hundred dollars, and its prohibiting Dr. Kabir from having a satellite television dish on his house while non-Iranian residents were permitted to have such dishes. She presents evidence that the WHOA agreed to reimburse a non-Iranian member for the cost of cleaning his pool "which was damaged by the Association's sprinkler," and another non-

Iranian member "for removal of a tree which could have damaged her fence," but denied Ms. Motakef's request for reimbursement for fence repairs after her fence was damaged by falling branches from trees from her upslope, which the WHOA has the responsibility to maintain. (Plaintiff's Exh. D, No. 5615; Mehri Motakef Decl., ¶ 62.) Ms. Motakef also states in her declaration that the WHOA agreed to repair and pay for Ms. Havel's block wall, but refused to pay for or repair another section of the same wall that was adjacent to Ms. Motakef's property. She also states that she and Mr. Kabir's slopes frequently were not cleared as throughly or as often as non-Iranian residents' slopes. This evidence, combined with Mr. Uffleman's disparaging statements about Iranians and Iranian men, raises a triable issue of fact whether Defendants discriminated in the provision of services to Ms. Motakef on the basis of her national origin, in violation of Civil Code sections 51 and 51.5. Consequently, the Court will deny Defendants' motion for summary judgment as to those claims.

### 3.    Civil Code Section 51.7

Defendants next argue that they are entitled to summary judgment on Ms. Motakef's claim pursuant to California Civil Code section 51.7. That section states that "[a]ll persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property ... on account of any characteristic listed or defined in subdivision (b) or (e) of [Civil Code] Section 51." CAL. CIV. CODE § 51.7(a). National origin is one of the characteristics listed in section 51. CAL. CIV. CODE § 51(b).

Ms. Motakef has not presented sufficient evidence to defeat summary judgment on her claim under section 51.7 because she has not presented evidence

of any violence or threats of violence by any of the Defendants.  Indeed, when asked in her deposition if she was aware of "any threats of violence by any of the defendants towards people of Iranian extraction," she responded, "Mr. Uffleman tries to succeed [on] his willful act [sic] through different method [sic], and one thing that he did was ... and I realize that was support of Mr. Uffleman – Mrs. Havel's grandson came to my son, attacking him, coming to my property, that he wants to get physical with him." (Defendants' Exh. 45, Mehri Motakef Depo., 112:5-14.)  Threats and violence by Mrs. Havel's grandson, however, cannot be the basis for liability against Mr. Uffleman because no evidence has been presented that the grandson acted as Mr. Uffleman's agent or that Mr. Uffleman did anything to encourage or aid in his violence or threats.[8]   Consequently, Court will grant summary judgment in Defendants' favor on Ms. Motakef's claim under Civil Code section 51.7.

### 4.    "Violation of Civil Rights," Civil Code Section 52.1

Ms. Motakef asserts a claim for "Violation of Civil Rights," under Civil Code section 52.1.  That section prohibits any "person or persons, whether or not acting under color of law," from "interfer[ing] by threats, intimidation, and coercion, or attempt[ing] to interfere by threats, intimidation, or coercion, with the

---

[8] Ms. Motakef argues in her opposition that "in their own papers Defendants provide evidence that plaintiff incurred threats of violence at the hands of defendants and that such violence was on the basis of her national origin." (Opposition, p.20.)  In support of that statement, Ms. Motakef cites nine "undisputed facts" set forth in Defendants' Statement of Undisputed Facts.  Each of those facts, however, pertains to violence committed and threats made by the Motakefs' neighbors rather than Defendants.  None of the facts sets forth any evidence of any involvement by any of the Defendants in the threats or violence.  Although some of the "undisputed facts" cite letters written by the Motakefs, the Court will not consider letters written by the Motakefs as evidence of the truth of the matters contained therein, because the letters are hearsay for that purpose.  *See* FED. R. EVID. 801(c).

31

exercise or enjoyment by any individual...of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this State." CAL. CIV. CODE § 52.1(a).  Individuals whose rights have been interfered with or attempted to be interfered with in the manner described in subsection (a) of section 52.1 may bring a civil action for damages, injunctive relief, and other appropriate equitable relief.  CAL. CIV. CODE § 52.1(b).  Because Ms. Motakef has presented no evidence that any of the Defendants used threats, intimidation, or coersion against her to violate any of her civil rights, the Court will grant summary judgment in Defendants' favor on her claim under section 52.1.

## 5.   Discrimination and Harassment, Fair Employment and Housing Act ("FEHA")

Defendants argue they are entitled to summary judgment of Ms. Motakef's claims for discrimination and harassment under California's Fair Employment and Housing Act, Government Code sections 12955(a), 12955(d), 12955(f), 12955(i), and 12955(k).

Government Code section 12955 provides in relevant part:

It shall be unlawful:

(a) For the owner of any housing accommodation to discriminate against or harass any person because of the ... national origin ... of that person.

(d) For any person subject to the provisions of Section 51 of the Civil Code, as that section applies to housing accommodations, to discriminate against any person on the basis of ... national origin ... or on any other basis prohibited by that section.

(f) For any owner of housing accommodations to harass, evict, or otherwise discriminate against any person in the sale or rental of housing accommodations when the owner's dominant purpose is retaliation against a person who has opposed practices unlawful under this section, informed law enforcement agencies of practices believed unlawful under this section, has testified or assisted in any proceeding under this part, or has aided or encouraged a person to exercise or enjoy the rights secured by this part. Nothing herein is intended to cause or permit the delay of an unlawful detainer action.

(i) For any person or other organization or entity whose business involves real estate-related transactions to discriminate against any person in making available a transaction, or in the terms and conditions of a transaction, because of ... national origin ...

(k) To otherwise make unavailable or deny a dwelling based on discrimination because of ... national origin.

California courts interpreting the FEHA, including Government Code section 12955, follow analogous case law interpreting the federal Fair Housing Act. *Walker v. City of Lakewood*, 272 F.3d 1114, 1125 (9th Cir. 2001), *certiorari*

1 *denied*, 535 U.S. 1017, 122 S.Ct. 1607(*citing Sada v. Robert F. Kennedy Med.*

2 *Center*, 56 Cal. App. 4th 138, 150 n.6 (1997)("In applying the provisions of the

3 FEHA, California courts often follow decisions construing federal

4 antidiscrimination statutes, as long as those decisions provide appropriate

5 guidance.")); *Moua v. City of Chico*, 324 F. Supp. 2d 1132, 1141 (E.D. Cal.

6 2004)("The provisions of FEHA involved in this case protect substantially the

7 same rights as the FHA provisions in issue and are subject to the same analysis.")

8 Because the above subsections of the FEHA protect essentially the same rights

9 protected under FHA sections 3604 and 3617 addressed above, Ms. Motakef's

10 FEHA claim is subject to the same analysis as her FHA claims.[9]  Consequently,

11 the Court will grant summary judgment in Defendants' favor on Ms. Motakef's

12 claim under FEHA section 12955.

13

14 **6.  FEHA Retaliation**

15

16

17 Ms. Motakef also brings a claim for retaliation in violation of the FEHA, on

18 the theory that Defendants "took wrongful actions against [Ms. Motakef] and other

19 people of Iranian origin or ancestry in retaliation for opposition to unlawful

20 housing practices under section 12955 of the California Government Code."

21 (Second Amended Complaint, ¶ 124.)   To make out a prima facie case of

22 retaliation under the FEHA, Ms. Motakef must show (1) that she engaged in a

23 protected activity, (2) an adverse housing consequence causally linked to that

24 activity, and (3) resulting damage. *San Pedro Hotel Co., Inc. v. City of Los*

25 *Angeles*, 159 F.3d 470, 477 (9th Cir. 1998)(discussing standard for retaliation

26 claims under the federal Fair Housing Act.)  Ms. Motakef's retaliation claim fails

27 _____

28 [9] The parties present the same arguments for and against both sets of claims, and
do not dispute that the same analysis applies.

because she has not presented any evidence of a causal link between the alleged discriminatory provision of services to her by Defendants and her engaging in any protected activity under the FEHA.  The Court will grant summary judgment in Defendants' favor on Ms. Motakef's FEHA retaliation claim.

### 7.    Conspiracy to Violate Civil Rights, 42 U.S.C. § 1985(3)

Defendants argue they are entitled to summary judgment of Ms. Motakef's claim for conspiracy to violate her civil rights in violation of 42 U.S.C. § 1985(3), because section 1985 does not protect against discrimination on the basis of national origin.  Section 1985(3) provides:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of

such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. §1985(3). To prevail on a section 1985(3) claim, Ms. Motakef must show "(1) the existence of a conspiracy to deprive [her] of the equal protection of the laws; (2) an act in furtherance of the conspiracy; and (3) a resulting injury." *Addisu v. Fred Meyer, Inc.*,198 F.3d 1130, 1141 (9th Cir. 2000). *See also Caldeira v. County of Kauai*, 866 F.2d 1175, 1181 (9th Cir. 1989)("meeting of the minds" must be shown to prove a conspiracy under section 1985.)

Even assuming that Defendants are incorrect that section 1985 does not protect against discrimination on the basis of national origin, Ms. Motakef's claim still fails because she had not presented any evidence of any conspiracy or "meeting of the minds" among the Defendants. *See McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993)(plaintiff inmate failed to state a section 1985(3) conspiracy claim where he did not allege any meeting of the minds among the alleged conspirators). Allegations that Mr. Uffleman had "cocktails" with Ms. Motakef's neighbors, and Ms. Motakef's subjective belief that a conspiracy existed, are insufficient. Indeed, Ms. Motakef testified that Mr. Uffleman told her to call the police when she called him to report her neighbors' harassment. Therefore, Ms. Motakef has not met section 1985's requirement of a conspiracy to deprive her of federal rights, and the Court will grant summary judgment in Defendants' favor on her Section 1985(3) claim.

### 8.      "Neglect to Prevent Violation of Civil Rights," 42 U.S.C. § 1986

Ms. Motakef also asserts a claim for "neglect to prevent violation of civil rights." (Second Amended Complaint, p.24.)  This claim arises under 42 U.S.C. §1986, which provides a cause of action against "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed."   42 U.S.C. § 1986.  As section 1986's one-year limitations period already had elapsed as to Mr. Uffelman and Gold Coast when Ms. Motakef filed her Complaint, the section 1986 claim is time barred as to all Defendants except the WHOA.

Ms. Motakef's section 1986 claim fails against the WHOA, because as explained above she has not presented any evidence of the existence of a conspiracy under 42 U.S.C. §1985(3).  *See Smith v. Bucci Detective Agency*, 316 F. Supp. 1284, 1285 (D.C.P.A. 1970)(plaintiff failed to state a claim under section 1986 where he did not "allege[] concrete facts tending to establish the existence of a conspiracy of which defendants had knowledge.")  Consequently, the Court will grant summary judgment against Ms. Motakef on her claim for "neglect to prevent violation of civil rights."

### 9.      Negligent Supervision

Ms. Motakef asserts a claim for negligent supervision against all Defendants.  As to Gold Coast and WHOA, Ms. Motakef's claim rests on a theory that Gold Coast and WHOA "knew or should have known about the wrongful, abusive, discriminatory, and harassing activities of Jerry Uffelman and other

1   employees ... yet they failed to properly supervise Jerry Uffelman and other
2   employees, servants, and agents to make sure such wrongful activities ceased."
3   (Second Amended Complaint, ¶ 187.) As to Mr. Uffelman, the claim rests on a
4   theory that he negligently failed to supervise employees of Gold Coast.
5   Defendants argue that the claim should be dismissed because there is no evidence
6   that WHOA or Gold Coast acted negligently with respect to Mr. Uffelman, or that
7   Mr. Uffelman acted negligently with respect to other employees.

8
9           California law holds an employer liable for negligently supervising an unfit
10  employee. *Doe v. Capital Cities*, 50 Cal. App. 4th 1038, 1054, 58 Cal. Rptr. 2d
11  122 (1996). The employer's liability rests on the fact that it either knew or should
12  have known that the employee created a particular risk and the actual
13  materialization of the event of which the risk was created. *Id.* Here, triable issues
14  of fact exist regarding whether WHOA and Gold Coast negligently failed to
15  protect against an apparent risk that Mr. Uffleman was discriminatorily providing
16  services to Ms. Motakef. As explained above, Ms. Motakef has presented
17  evidence that Mr. Uffelman caused WHOA services to be provided in a
18  discriminatory manner on the basis of her national origin and that she complained
19  about the discrimination to Mr. Uffelman and the WHOA between 1998 and 2001.
20  WHOA dismissed Gold Coast and Mr. Uffelman on February 25, 2002, effective
21  June 25, 2002. (Plaintiff's Statement of Undisputed Facts, No. 42.) Whether
22  WHOA and/or Gold Coast acted negligently in failing more closely to supervise
23  Mr. Uffelman, or in failing to terminate him earlier, is a question of fact.
24  Accordingly, the Court will not grant Defendant's motion for summary judgment
25  on Ms. Motakef's claim for negligent supervision as to WHOA or Gold Coast.

26
27          No triable issues are raised as to Mr. Uffelman's own liability for negligent
28  supervision, however. Ms. Motakef presents no evidence that any employee under

Mr. Uffelman's supervision acted to cause her damages, or that Mr. Uffelman acted negligently in failing to supervise such an employee. Consequently, the Court will grant summary judgment in favor of Mr. Uffleman on Ms. Motakef's negligent supervision claim.

### 10. Unfair Business Practices, Business and Professions Code §§ 17200 *et seq.*

Ms. Motakef asserts a claim against all Defendants pursuant to California's Unfair Competition Law, Business and Professions Code section 17200 *et seq.* Defendants urge the Court to grant summary judgment of the UCL claim because, they argue, "members of the general public are not likely to be deceived or harmed by the administration of a private homeowner association's rules and regulations." (Motion for Summary Judgment, p.24.) Ms. Motakef counters that she has presented evidence of "discriminatory practices as well as otherwise illegal business practices." (Opposition, p.21.)

To prevail on a claim for violation of California Business and Professions Code Section 17200 *et seq.*, Ms. Motakef must show that Defendants engaged in an "unlawful, unfair or fraudulent business act or practice," "unfair, deceptive, untrue, or misleading advertising" or "any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." CAL. BUS. & PROF. CODE §17200. Claims under section 17200's "unlawful" business practices prong may be predicated on underlying violations of state antidiscrimination laws, such as the Unruh Act, Civil Code section 51. *See, e.g., Reese v. Wal-Mart Stores, Inc.*, 73 Cal. App. 4th 1225 (1999)(Section 17200 claim based on alleged violation of the Unruh Act.) Because the Court has found that Ms. Motakef has presented sufficient evidence to

withstand summary judgment on her claims pursuant to Civil Code sections 51 and 51.5, she has presented sufficient evidence to support a claim under the UCL based on violations of those sections. Also, as the statute of limitations on claims under the UCL is four years rather than one year,[10] Ms. Motakef's UCL claim is not time-barred as to Mr. Uffleman and Gold Coast. Consequently, the Court will deny Defendant's motion for summary judgment on her UCL claim.

## III.    Leave to Amend

Ms. Motakef requests leave to file a Third Amended Complaint, which would add four new Defendants and various new allegations. As a scheduling order was entered in this case on October 4, 2004,[11] Federal Rule of Civil Procedure 16(b), and not Rule 15(a), determines whether amendment is proper. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607 (9th Cir. 1992)(after entry of a scheduling order, Rule 16 and not Rule 15 governs motions for leave to file an amended complaint). Under Rule 16(b), a party may amend its pleading after entry of a scheduling order only for "good cause." *Id.* at 608; FED. R. CIV. P. 16(b). This is a different standard from Rule 15(a): whereas Rule 15 focuses on bad faith of the party seeking to amend and prejudice to the opposing party, the focus of Rule 16's "good cause" inquiry is whether the party seeking amendment has acted diligently. *Johnson.* at 609.

Ms. Motakef has failed to show the requisite good cause to amend her complaint, because she has not shown she acted diligently in seeking amendment. This case has been pending for almost three years, since October 2003. Although

---

[10] CAL. BUS. & PROF. CODE § 17208.

[11] That order was modified by a subsequent order dated April 25, 2005 and a stipulation by the parties dated October 17, 2005.

1   Ms. Motakef states that she only learned the bases for her proposed new claims

2   after taking certain depositions and receiving certain documents from Defendants

3   in March and April 2006, she gives no reason why she could not have obtained

4   that deposition testimony or those documents earlier in the case. Her motion for

5   leave to file a third amended complaint, and her counsel's accompanying

6   declaration, state merely that "[d]uring discovery [Plaintiff] discovered facts that

7   give rise to the [proposed] additional causes of action," and that "[t]he [proposed]

8   Amended and Supplemental Complaint adds causes of action regarding

9   transactions, occurrences, and events which have happened since the date this case

10  was filed." (Grace Decl. in Support of Motion to File Third Amended and

11  Supplemental Complaint, ¶¶ 7-8.) Although Ms. Motakef states in her opposition

12  to the summary judgment motion that certain documents were only recently

13  produced by Defendants, she does not claim that Defendants' failure to produce

14  the documents is the reason she could not earlier have filed her motion to amend

15  her Complaint. In sum, Ms. Motakef has not presented sufficient evidence or

16  argument to meet her burden under Rule 16. Given the absence of substantial

17  evidence that Ms. Motakef acted diligently in discovering the basis for her

18  proposed new claims and defendants, the Court declines to allow amendment at

19  this late stage in the case.

20

21  **IV.   Discretionary Dismissal of Remaining State Claims**

22

23          As the Court has granted summary judgment of Ms. Motakef's federal

24  claims, the only claims remaining for trial are state claims pursuant to Civil Code

25  sections 51 and 51.5, Business & Professions Code section 17200, and for

26  negligent supervision. Where a court has entertained state law claims alongside

27  federal claims under its supplemental jurisdiction, and the federal claims are

28  dismissed before trial, the court has discretion to decline jurisdiction over the

remaining state law claims. *Brady v. Brown*, 51 F.3d 810, 816 (9th Cir. 1995); *Dyack v. Commonwealth of Northern Mariana Islands*, 317 F.3d 1030, 1037-38 (9th Cir. 2003)("In light of the District Court's grant of summary judgment to defendants on [plaintiff's] only federal claim, the court did not abuse its discretion in dismissing the state law claims.") In exercising its discretion, the court should consider "factors such as economy, convenience, fairness, and comity." *Brady*, 51 F.3d at 816.  Here, the Court believes the most appropriate course of action is to dismiss Ms. Motakef's state claims, because they could more economically and expeditiously be resolved in state court.  In addition, the interests of comity favor declining jurisdiction because the state court likely has extensive experience with cases involving homeowners' associations.

## V.    Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to each of Ms. Motakef's claims, except for her claims against all Defendants pursuant to Civil Code sections 51 and 51.5 and Business & Professions Code section 17200, and her claim against WHOA and Gold Coast for negligent supervision.  Ms. Motakef's motions for additional discovery and for leave to file a third amended complaint are DENIED.  Because all federal claims have been dismissed, and in the interest of economy, efficiency, and comity, all remaining claims are dismissed.

DATED: 6-26-06

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE